**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| X CORP.<br><br>                    Movant,<br><br>v.<br><br>ERNST & YOUNG, LLP,<br><br>                    Respondent. | Case No. _____<br><br>Underlying Case, *United States v. Twitter*, pending in the United States District Court for the Northern District of California:<br><br>No. 22 Civ. 3070 |

## X CORP.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO COMPEL COMPLIANCE WITH SUBPOENA *DUCES TECUM*

## I.  INTRODUCTION

As part of a consent order entered into with the Federal Trade Commission (FTC), X Corp. (successor in interest to Twitter, Inc.) was required to retain "qualified, objective, independent third-party professionals" to evaluate the company's privacy and information security program.  X Corp. retained EY for that role.  X Corp. recently learned, however, that the FTC has undertaken an extraordinary and highly improper pressure campaign attempting to influence EY's evaluation.  That startling revelation led X Corp. to file a motion in the Northern District of California seeking prospective relief from the consent order.  X Corp. has sought continually to obtain from EY documents and information relevant to the FTC's misconduct and to X Corp.'s motion, but EY— likely fearing the FTC's wrath—has not produced it.  The nonprivileged information that X Corp. seeks from EY is directly relevant to X Corp.'s pending motion.  It would be hard to imagine anything more relevant to a claim of witness intimidation than documents from that witness.  X Corp.'s request therefore readily satisfies the standard for discovery under the Federal Rules of Civil Procedure, and this Court should compel EY to comply with the subpoena.

More specifically, X Corp.'s motion argues that the FTC's investigative conduct demonstrates that its investigation has become infected by bias and no longer serves lawful purposes.  As relevant here, recent sworn testimony by EY's lead engagement partner details how the FTC, through a series of interactions with EY shortly after Elon Musk acquired Twitter, attempted to co-opt EY's independent assessment in order to generate evidence of "deficiencies in Twitter's privacy and information security program."  These efforts included dictating to EY "very specific types of procedures that they expected" EY to perform and "[conveying] expectations … about what th[e] results should be before [EY] had even begun any procedures."  The FTC was so "adamant" with EY, conveying that "this is absolutely what you will do and this is going to occur,

and you'll produce a report at the end of the day" that would be negative about Twitter, that senior EY leaders feared that, if EY resigned as the independent assessor, "[t]he FTC [would] take[] exception to [EY's] withdrawal and create[] 'other' challenges for EY over time."  In sworn testimony, EY's representative stated he "felt as if the FTC was trying to influence the outcome of the engagement before it had started."

EY thus has critical information necessary to the fair adjudication of X Corp.'s pending motion.  But aside from a handful of documents introduced during the testimony of the EY engagement lead, X Corp. has no insight into the documentary evidence of the FTC's meddling in EY's assessment, nor the impact of the FTC's uncommon belligerence toward EY.  X Corp. has reason to believe that within EY's possession, custody, or control there exists additional evidence of the FTC's prejudgment of its investigation into X Corp., its bad-faith efforts to manufacture evidence damaging to X Corp., and other inequitable conduct warranting the relief sought in X Corp.'s motion.  X Corp. explained this to EY and worked in good faith to identify a reasonable category of materials for EY to produce, but EY would agree only to a few emails memorializing discussions with the FTC.  This left X Corp. with no choice but to subpoena EY.

In response, EY halfheartedly asserted a list of boilerplate, general objections that fail to provide specifics as to purported lack of relevance, breadth, burden, and proportionality with respect to the actual document requests at issue.  The Court should overrule those meritless objections and order EY to comply with the subpoena in full.

## II.     FACTUAL BACKGROUND

### A.     Twitter's First Consent Order with the FTC

Twitter and the FTC first entered into a consent order in 2011.  Decision & Order, *In the Matter of Twitter, Inc.*, Docket No. C-4316 (F.T.C. Mar. 2, 2011), bit.ly/3JS2P2M (the "2011 Order").  The 2011 Order resulted from an FTC investigation into incidents of unauthorized access

to Twitter's systems and resolved charges that Twitter violated the FTC Act, 15 U.S.C. § 45, by misrepresenting the extent to which it protected nonpublic user information from unauthorized access and honored users' privacy choices.  Complaint at 3–5, *In the Matter of Twitter, Inc.*, Docket No. C-4316 (F.T.C. Mar. 2, 2011), bit.ly/3XQlK47.  The 2011 Order required Twitter, among other things, to establish a "comprehensive information security program" meeting certain parameters and to obtain biennial assessments of that program by a third-party professional.  2011 Order at 3–4.  Over the next eight years, from 2011 to 2019, Twitter operated under the 2011 Order and completed required assessments while receiving approximately ten demand letters from the FTC.  Koffmann Decl. ¶ 19.

### B.      Twitter's Second Consent Order with the FTC

In October 2019, Twitter publicly and voluntarily disclosed that, "some email addresses and phone numbers provided for account security may have been used unintentionally for advertising purposes."  *See* Twitter Support (@TwitterSupport) Twitter (Oct. 8, 2019, 4:02 PM), bit.ly/43i8fel; *see also* Concurring Statement of Comm'r Christine S. Wilson and Comm'r Noah Joshua Phillips, Twitter, Matter No. 2023062 at 6 (May 25, 2022), bit.ly/43h5euU.  The FTC investigated the report, sending approximately 15 demand letters to Twitter over a two-year period.  Koffmann Decl. ¶ 20.  On May 25, 2022, the Department of Justice and the FTC filed a complaint in the Northern District of California alleging that Twitter violated the 2011 Order and Section 5 of the FTC Act by misrepresenting the extent to which Twitter maintained and protected the privacy of nonpublic consumer information.  *United States v. Twitter*, Dkt. 1.  On May 26, 2022, the Northern District of California court entered a Stipulated Order for Civil Penalty, Monetary Judgment, and Injunctive Relief resolving the 2022 complaint.  *United States v. Twitter*, Dkt. 11.  Twitter consented to the FTC's reopening of the 2011 proceeding and entry of the new consent order attached to the Stipulated Order, which the FTC did on May 26, 2022.  Decision & Order,

*In re Twitter, Inc.*, Docket No. C-4316, (F.T.C. May 26, 2022), bit.ly/44IrdvJ (the "Consent Order").

The Consent Order created a compliance structure tailored to Twitter's operations at that time.  Part V of the Consent Order mandates that Twitter establish and maintain a "comprehensive privacy and information security program" (the "Program") in order to "protect[] the privacy, security, confidentiality, and integrity" of certain user information.  Consent Order at 4.  The Order details the required content of the program, including, for example, the development and evaluation of risk-appropriate safeguards, employee training, and monitoring and reporting of certain security incidents to the FTC.  *See* Consent Order Part V.E–I.  The Order required Twitter to implement the Program by November 22, 2022.  *Id.*, Part V.

### C.      EY's Role

Assessment of Twitter's Program by "qualified, objective, independent third-party professionals" forms a core part of the Consent Order.  Consent Order at 8.  As the FTC itself explained in relation to an analogous provision of the 2011 Order:  "The very purpose of a security or privacy order's assessment provision is to ensure that evaluation of a respondent's security or privacy program is truly objective—*i.e.*, unaffected by the interests (or litigation positions) of either the respondent or the FTC."  Ex. 2.  Part VI of the Order sets forth detailed requirements for those assessments, which must cover five specific elements:   (1) whether Twitter "has implemented and maintained the Program," (2) "the effectiveness of [Twitter's] implementation and maintenance" of the Program, (3) identification of "any gaps or weaknesses in, or instances of material non-compliance with, the Program[,]" (4) the status of any previously identified gaps or weaknesses, and (5) identification of the evidence the assessor relied upon and an explanation of why that evidence was appropriate and sufficient for its analysis.  Consent Order Part VI.D.  The assessor must sign its work and certify that it "conducted an independent review of the Program

and did not rely primarily on assertions or attestations by [Twitter's] management." *Id.* The independence of the assessor is paramount. *Id.*

In July 2022, Twitter executed a Statement of Work ("SOW") with accountancy EY to perform the initial assessment required under Part VI. EY agreed to perform services in accordance with the American Institute of Certified Public Accountants' Standards for Consulting Services 100 (the "Professional Standards"). Ex. 3 at 3. The Professional Standards required EY to "[s]erve the client interest by seeking to accomplish the objectives established by the understanding with the client while maintaining integrity and objectivity." Ex. 4 at 4. EY further agreed in the SOW that "EY [would] not: ... Perform any task or service that in EY's judgment may impair EY's independence to provide future services of the Subject Matter under the audit or attestation standards." Ex. 3 at 3. Similarly, the Code of Professional Conduct for Certified Public Accounts ("CPAs") requires that when performing professional services, CPAs "shall maintain objectivity and integrity, shall be free of conflicts of interests, and shall not knowingly misrepresent facts or subordinate his or her judgment to others." Code of Pro. Conduct R. 1.100.001 (Am. Inst. of Certified Pub. Accts. 2020), bit.ly/3NVT7xU ("AICPA Code of Conduct"). That Code defines "adverse interest threat" and "undue influence threat" as categories of "circumstances that could impair independence." *Id.* Rule 0.400.49. Undue influence threats include attempts by interested parties "to coerce the [CPA] or exercise excessive influence." *Id.* R. 1.210.010.16. CPAs also have an ethical obligation to avoid or resolve "[o]bstacles to following an appropriate course of action due to internal or external pressures." *Id.* R. 1.000.020.

### D.     Elon Musk's Acquisition of Twitter

On April 25, 2022, Elon Musk signed an agreement with Twitter to acquire the company and take it private, effective October 27, 2022. Koffmann Decl. ¶ 21. As Twitter later explained to the FTC during the post-acquisition period, "Twitter [was] undergoing a fundamental

transformation" that involved, among other things, "a substantial overhaul of its organizational structure, budgeting, revenue-generation priorities, and other fundamental aspects of the business." Ex. 5.  As part of Mr. Musk's new plan for the company, Twitter, Inc. was merged into X. Corp., with X Corp. as the surviving entity, on March 15, 2023.  Ex. 6.

### E.      The FTC's Attempts to Influence the Independent Program Assessment

On June 21, 2023, the FTC deposed David Roque, the engagement partner for EY's independent assessment of Twitter's Program.  Ex. 7.  The deposition came about because EY resigned its position as X Corp.'s independent assessor on February 27, 2023.  The FTC—already in the throes of an investigation into Twitter that the agency itself chose to publicize—issued subpoenas seeking documents and testimony from EY immediately upon EY's resignation.  Ex. 8.

Mr. Roque's testimony and the documents introduced at his deposition raised serious concerns about the way the FTC has conducted its investigation.  For example, Mr. Roque testified that the FTC's conduct made him "fe[el] as if the FTC was trying to influence the outcome of the engagement before it had started."  Ex. 7 at 120:20–22.  He testified:

> [EY's] obligation under our contract is to go in and do the independent assessor report and then report the facts based on the results. In some of the discussions that we were having with the FTC, expectations were being conveyed about what those results should be before we had even begun any procedures, and I was concerned that there was this adversarial situation occurring where you had two competing parties that, stepping back, both had a desire for a certain outcome to occur that may not have always been aligned.

*Id.* at 122:4-14.  "[T]he way the conversations with the FTC were transpiring" was so startling and unusual that Mr. Roque worried that the FTC posed "an adverse threat [to EY]," meaning that the FTC constituted "somebody outside of the arrangement [EY] had with Twitter trying to influence the outcome of [EY's] results."  *Id.* at 120:23–121:2.

When the FTC attorney deposing Mr. Roque asked him to confirm that "no one from the FTC directed you to reach a particular conclusion about Twitter's program," he explained that, to the contrary, "[t]here w[ere] suggestions of what they would expect the outcome to be."  *Id.* at 122:20–24.  Mr. Roque testified that the "outcome" he perceived the FTC expected was that EY "would conclude that there were deficiencies in Twitter's privacy and information security program."  *Id.* at 120:20–22, 200:19–201:3.

Mr. Roque also detailed the heavy-handed manner in which the FTC sought to ensure EY would generate evidence damaging to Twitter.  He testified that the FTC communicated to EY "that Ernst & Young, under all circumstances, will be conducting and issuing a report on behalf of the FTC order.  So it was sort of like it was very adamant about this is absolutely what you will do and this is going to occur, and you'll produce a report at the end of the day."  *Id.* at 200:2–8.  Mr. Roque felt this adamance was "surprising" given that the FTC could not know what would "transpire[] over the next six to seven months before that report was due."  *Id.* at 200:9–12.  The FTC also told Mr. Roque that the "FTC would be surprised if there [were] areas on our report that didn't have findings based on information the FTC was already aware of," and that if EY "didn't have findings in those areas" then it "should expect the FTC would follow up very significantly to understand why we didn't have similar conclusions."  *Id.* at 124:14–21.

Mr. Roque also testified that at a meeting in January 2023, the FTC gave EY "a list of specific[] . . .  types of procedures they were expecting us to execute" and "provid[ed] areas that they were expecting us to look at" in connection with its "independent" assessment under the Consent Order.  *Id.* at 201:11–15.  "It was almost as if [they] were giving us components of our audit program to execute."  *Id.* at 203:17–21.  Mr. Roque explained that this level of "third party" involvement in an independent testing engagement was "unusual," especially since EY conceived

of its auditing role as limited to "look[ing] at the processes and controls" that make up the required elements of the Program and how they operate, "[n]ot going into some of the one-offs, very specific details [FTC staff] were asking us about." *Id.* at 203:13–204:25.

Contemporaneous communications within EY corroborate Mr. Roque's testimony. For example, Mr. Roque and his EY colleagues were concerned that, by "pressuring [EY] to reach a specific outcome," the FTC's conduct had created an "[u]ndue influence threat" that interfered with EY's "ab[ility] to be objective." Ex. 9 at 1; *see also* Ex. 10 at 3 (discussing how the FTC's conduct jeopardized EY's ability to "act with objectivity"). Other internal EY communications show that Mr. Roque perceived a risk that, if EY resigned as Twitter's independent assessor, "[t]he FTC [will] take[] exception to our withdrawal and create[] 'other' challenges for EY over time." Ex. 11 at 1.

**F.      X Corp.'s Motion To Terminate the Consent Order**

X Corp. attempted to resolve its dispute with the FTC without judicial intervention, but its attempts served only to compound its concerns about the FTC's bias and partiality. Following the deposition of Mr. Roque, the company sought information and documents from the FTC regarding its contacts with EY, the company that succeeded EY as Twitter's independent assessor, and another company that Twitter considered but did not select to succeed EY. Ex. 12. In its July 6, 2023 response, the FTC stonewalled and refused to provide any information, much less evidence, that would dispel the inescapable conclusion that it had prejudged its investigation of X Corp. and Mr. Musk. Ex. 13. Instead, the FTC's letter spent pages laying out an argument that Mr. Roque's testimony could establish a violation of Part VII of the Consent Order before asserting that the agency "hold[s] no preconceived notions for the outcome of this investigation. . . . Over the past several years, we investigated numerous privacy and data security issues at [pre-Musk] Twitter that did not result in enforcement action." *Id.* at 5. In response to X Corp.'s follow-up letter, the

FTC asserted that its "rights to seek information and obtain discovery are not reciprocal" and threatened to treat failure to comply with its demands as violations of the Consent Order.  Ex. 14.

On July 13, 2023, X Corp. filed a motion seeking (1) a protective order staying the notice of deposition of Elon Musk, and (2) an order terminating or modifying the consent order or staying enforcement of the consent order.  Ex. 1.  This motion, which is set for hearing on November 16, 2023, asks the court to rein in the FTC's investigation that has spiraled out of control and become tainted by bias, and to terminate a misfit consent order that no longer can serve any proper equitable purpose.  The FTC's communications with EY lie at the heart of X Corp.'s motion, which alleges that the FTC's irregular and improper conduct is an attempt to co-opt EY's independent assessment in order to generate evidence of deficiencies in X Corp.'s privacy and information security program.

### G.     X Corp.'s Attempts to Obtain Relevant Evidence From EY

Before sending its subpoena, X Corp. sought the voluntary production of documents from EY.  Over the course of numerous phone calls and emails, counsel for X Corp. requested the following documents:

1.     All written communications between EY and FTC/FTC staff from May 26, 2022 to present.

2.     All documents, communications, or other materials that describe, summarize, memorialize, or otherwise record or attempt to record any oral communications between EY and FTC/FTC staff from May 26, 2022 to present.

3.     All other documents or communications relating to written or oral communications with FTC/FTC staff from May 26, 2022 to present.

Koffmann Decl., ¶ 22; Ex. 15.  Counsel for X Corp. offered to discuss any privilege issues that might arise.  *Id.*; Koffmann Decl., ¶ 22.

EY declined to produce anything except for "EY's non-privileged communications with the FTC – on the condition that Twitter does not subsequently seek the production of additional

EY materials." Ex. 15.

**H.    X Corp.'s Subpoena to EY**

On August 3, 2023, in accordance with Rule 45(a)(4) of the Federal Rules of Civil Procedure, X Corp. served the subpoena on EY.  The subpoena seeks, in relevant part, the following:

1.    All communications between EY and the FTC.

2.    All documents or communications that describe, summarize, memorialize, or otherwise record or attempt to record any oral communications between EY and the FTC.

3.    All other documents or communications relating to written or oral communications between EY and the FTC.

4.    All communications relating to David Roque's testimony on June 21, 2023.

5.    All communications relating to the motion filed by X Corp. in United States v. Twitter on July 13, 2023.

Ex. 16.

**I.    EY's Boilerplate Objections to the Subpoena**

On August 15, 2023, EY served responses and objections to the subpoena.  Ex. 17.  In its response, EY refused to produce *any* documents, despite its prior agreement to produce certain materials.  *See id.*  In purported support of its objections, EY recited the following rote objections, among others:  "The subpoena is overly broad, unduly burdensome, . . . seeks documents that are not relevant to the claims or defenses of any party to the Action, . . . [violates] Rule 26(f), . . . seeks information or requests the production of documents that are protected from discovery by the attorney-client privilege, the work product doctrine, or any other applicable privilege, . . . [is] vague, . . . seeks information or requests the production of documents . . . which are not reasonably accessible . . . [and] imposes an insufficient amount of time for compliance."  *Id.*

On August 21, 2023, counsel for X Corp. and EY met and conferred via telephone conference regarding the subpoena, and counsel for X Corp. offered to narrow the scope of Requests 1, 2, and 3 to communications between EY and the FTC that related to Twitter, X Corp., or Mr. Musk.  Koffmann Decl. ¶ 23.  X Corp. also offered to narrow the subpoena to the documents that EY previously produced to the FTC in response to the FTC's subpoena.  *Id.*  On August 24, 2023, counsel for EY confirmed that EY would not be producing any documents in response to X Corp.'s subpoena.  *Id.*

## III.    LEGAL STANDARD

Rule 45 of the Federal Rules of Civil Procedure provides that—via a subpoena—a party may command a non-party to (i) produce documents in its possession, custody, or control and (ii) attend and testify at a deposition.  Fed. R. Civ. P. 45(a)(1)(A)–(B).  Courts first "consider whether the discovery sought is relevant to a party's claim or defense in the underlying litigation, as defined in Rule 26(b)(1)."  *BuzzFeed, Inc. v. Dep't of Justice*, 318 F. Supp. 3d 347, 356 (D.D.C. 2018).[1]  The relevant standard under Rule 45 is the same as under Rule 26.  *Stati v. Kazakhstan*, Civil Action No. 14-1638 ABJ/DAR, 2020 WL 3259244, at *4 (D.D.C. June 5, 2020).  Under this standard, "[a] party may . . . issue a subpoena 'regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case.'"  *Id.* (quoting Fed. R. Civ. P. 26(b)(1)).  In this context, something is relevant "if there is *any* possibility that the information sought may be relevant to the claim or defense of any party."  *In re Denture Cream Prods. Liability Litig.*, 292 F.R.D. 120, 124 (D.D.C. 2013) (emphasis added).  "The party moving to compel production of documents bears the initial burden of explaining how the requested

---

[1]  Unless otherwise indicated, this brief omits internal quotation marks, citations, alterations, and omissions from legal citations.

information is relevant." *Jewish War Veterans of the U.S. of Am., Inc. v. Gates*, 506 F. Supp. 2d

30, 42 (D.D.C. 2007). "Once that showing is made, however, the burden shifts to the objecting

party to explain why discovery should not be permitted." *Id.*

Next, the Court assesses objections by the recipient under Rule 45, which directs courts to

"quash subpoenas that call for privileged matter or [that] would cause an undue burden." *Watts v.

S.E.C.*, 482 F.3d 501, 508 (D.C. Cir. 2007). "The burden lies on the party resisting discovery to

show that the documents requested are either unduly burdensome or privileged." *In Re Micron

Tech., Inc. Secs. Litig.*, 264 F.R.D. 7, 9 (D.D.C. 2010).

## IV.     ARGUMENT

X Corp.'s subpoena seeks relevant documents going to the heart of its argument for relief

from the consent order. EY's objections are (i) boilerplate and insufficient to meet its burden of

establishing that the requested discovery should be denied, (ii) meritless, or (iii) inapplicable. The

Court should overrule EY's objections and order it to comply with X Corp.'s subpoena in full.

### A.     The Subpoena Seeks Relevant Documents

X Corp.'s subpoena seeks documents and communications directly relevant to its claim

that FTC misconduct has tainted the investigation in the underlying action. EY's documents could

hardly be *more* relevant, since the testimony of one of its partners about his exchanges with FTC

staff is a critical piece of evidence supporting X Corp.'s motion. As Mr. Roque's testimony

revealed, the FTC's conduct made him "fe[el] as if the FTC was trying to influence the outcome

of the engagement before it had started." Ex. 7 at 120:20–22. "In some of the discussions … with

the FTC, expectations were being conveyed about what those results should be before we had even

begun any procedures." *Id.* at 122:3–10. According to Mr. Roque, he felt that the FTC was

attempting to "influence" EY to reach the conclusion that "there were deficiencies in Twitter's

privacy and information security program." *Id.* at 120:20–22, 200:19–201:3. He was so concerned

by the FTC's communications that he and his colleagues discussed whether the agency threatened to become an "adverse threat" to EY's independence or a party "outside of the arrangement we had with Twitter trying to influence the outcome of our results." *Id.* at 120:20–121:2.

The choice of words is meaningful—Mr. Roque was worried that the FTC was making itself an adverse or undue influence threat to EY's contractual, ethical, and professional obligations. *See* AICPA Code of Conduct R. 1.210.010.16 (defining undue influence threat to include attempts by "interested parties to coerce the [CPA] or exercise excessive influence"). Nor did the FTC stop at applying pressure for its favored outcome:  it also attempted to dictate the content and procedures of EY's assessment. Mr. Roque testified that "[i]t was almost as if [FTC staff] were giving us components of our audit program to execute." Ex. 7 at 203:17–21. He explained that this level of "third party" involvement in an independent testing engagement was "unusual," especially because EY's role was to "look at the processes and controls" that make up the required elements of the Program and how they operate, "[n]ot [to] go[] into some of the one-offs, very specific details [FTC staff] were asking us about." *Id.* at 203:13–204:25.

Evidence of FTC overreach can be seen in the limited set of EY's internal communications already obtained by X Corp., dating to when EY considered resigning as the independent assessor. At the same time that EY was "concern[ed]" that the FTC constituted an "[u]ndue influence threat" because it is "pressuring us to reach a specific outcome and therefore we may not be able to [be] objective," Ex. 9, senior EY leaders perceived the risk that, if they were to resign, "[t]he FTC [will] take[] exception to our withdrawal and create[] 'other' challenges for EY over time." Ex. 11.

This record is alarming.  It shows how the FTC has attempted to bully EY into acting as an arm of its enforcement staff digging up dirt on X Corp., rather than an objective, independent, third-party auditor bound by its own contractual, ethical, and professional obligations of

independence and objectivity.  This is extraordinary misconduct and central to X Corp.'s claims that the FTC has improperly influenced the content and outcome of an investigation that the Consent Order requires to be objective and independent.  The FTC's efforts to trample the professional, contractual, and ethical obligations of EY in an attempt to engineer the outcome of an "independent" assessment has infected the FTC's investigation with unfairness, and EY's communications with the FTC played a central role.

In short, the FTC appears to have engaged in a form of witness tampering; whatever else can be said about that conduct, the witness's testimony is surely relevant to assessing it.  X Corp.'s subpoena therefore seeks "matter that bears on, or that reasonably could lead to other matter that could bear on" its claims.  *United States ex. Rel. Shamesh v. CA, Inc.*, 314 F.R.D. 1, 8 (D.D.C. 2016).  Discovery of EY's communications with the FTC would shed further light on the extent to which the FTC sought to influence EY's independent assessment of X Corp. so that it would reach the FTC's favored outcome instead of the one that an objective, unbiased assessment would reach.  Those documents are therefore not just "relevant," but *critical*, to the "claim" X Corp. asserts in the underlying action.  *In re Denture Cream Prods. Liability Litig.*, 292 F.R.D. at 124.

EY's relevance arguments are misplaced.  First, EY is wrong that "there are no claims or defenses pending" in the Northern District of California.  Ex. 17 at 2.  As EY recognizes, "[t]he Court retained jurisdiction 'for purposes of construction, modification, and enforcement' of the Stipulated Order," Ex. 17 at 2, and X Corp.'s motion to modify the Consent Order is currently pending, *see United States v. Twitter*, Dkt. 17 (motion for Protective Order and Relief from Consent Order filed July 13, 2023); Dkt. 33 (order granting stipulation extending deadlines to respond to motion through fall); Dkt. 34 (setting hearing on motion for November 2023).  The discovery requests pertain directly to X Corp.'s claim for relief under Rule 60.  *See* Ex. 16 at 8

(seeking "All communications relating to the motion filed by X Corp. in [United States v. Twitter] on July 13, 2023[.]").

Second, it is irrelevant that the Consent Order authorizes the FTC to seek extra-judicial discovery.  X Corp. has every right to seek this discovery in connection with its pending motion to modify the consent order.  A federal district court possesses the power to enforce its judgments, including consent decrees.  *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 432 (2004) ("Federal courts are not reduced to approving consent decrees and hoping for compliance.  Once entered, that decree may be enforced."); *United States v. Conces*, 507 F.3d 1028, 1039–40 (6th Cir. 2007) (recognizing permissibility of post-judgment discovery for purpose of monitoring compliance with the court's judgment and award of injunctive relief).  One tool to aid the court in enforcing its judgments is discovery, and post-judgment discovery may inform how the Consent Order should be enforced and whether it should be modified.  *Id.*; *California Dep't of Soc. Servs. v. Leavitt*, 523 F.3d 1025, 1033 (9th Cir. 2008) (determining courts have inherent power to enforce their judgments, including by granting post-judgment discovery to determine compliance with judgments and orders); *cf.* Fed. R. Civ. P. 69(a)(2) (permitting discovery "[i]n aid of the judgment or execution" for money judgments); *Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 137–38 (2014) (ruling in favor of motion to compel third-party discovery post-judgment).  EY's objection misapprehends the nature of the court's continuing jurisdiction and the direct relevance of the documents sought to X Corp.'s pending motion, and should be overruled.

Third, it is notable that EY raised no relevance objections when the FTC sought discovery from EY back in March.  If EY's documents and testimony were relevant to the FTC's investigation into X Corp., they surely must be relevant to X Corp.'s contention that the FTC's bullying, overreach, and other misconduct in the course of its investigation justify termination or

modification of the consent order.  EY cannot credibly maintain that the documents X Corp. seeks in the subpoena are not relevant to X Corp.'s motion when the documents the FTC obtained through subpoena state that the FTC was  "pressuring [EY] to reach a specific outcome," Ex. 9 at 1; the FTC's conduct had created an "[u]ndue influence threat" that interfered with EY's "ab[ility] to be objective," *id.*; and [t]he FTC [will] take[] exception to our withdrawal and create[] 'other' challenges for EY over time."  Ex. 11 at 1.

### B.    EY's Boilerplate Objections Are Insufficient To Meet Its Burden

EY's formulaic recitation of generic objections to the subpoena cannot rebut X Corp.'s showing of relevance.  Courts appropriately reject such objections because they "do not comply with Fed. R. Civ. P. 34(b)."  *United States v. Mass. Hous. Fin. Agency*, No. 99 Civ. 1343 (RCL), 2005 WL 8178349, at *3 (D.D.C. Aug. 23, 2005).  "Vague and conclusory assertions are not sufficient; rather, a showing of undue burden 'must be specific' and concrete."  *Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*, No. 13 Civ. 1053 (RCL), 2019 WL 5864595, at *2 (D.D.C. Nov. 8, 2019).  In this instance, EY's response to the subpoena recites boilerplate objections with no examples or reasoning as to how they apply to each request.  *See* Ex. 17.  The Court should overrule these boilerplate objections for this reason alone.  *See Mass. Hous. Fin. Agency*, 2005 WL 8178349, at *3 ("Specific objections are required, because the requesting party and the court must be able to effectively evaluate the propriety of objections."); *see also Kinetic Concepts, Inc. v. ConvaTec Inc.*, 268 F.R.D. 226, 247 (M.D.N.C. 2010).  Furthermore, as explained below, all the objections enumerated above—including the boilerplate objections—are meritless or inapplicable.

### C.    Rule 26(f) Has No Bearing On EY's Obligations To Respond

EY's objection based on a vague allusion to Rule 26(d) of the Federal Rules of Civil Procedure is likewise misplaced.  To the extent EY believes Rule 26 requires X Corp. to meet and confer with it before serving a third-party subpoena, EY is incorrect.  Rule 26(d)(1) refers to a

meet and confer between "*the parties*," and EY is not a party to the underlying case.  Either way, counsel for X Corp. and counsel for EY met and conferred numerous times prior to X Corp.'s issuance of the subpoena.  Koffmann Decl. ¶ 22.  If the objection is that X Corp. was required to meet and confer with Plaintiff the United States before serving any discovery related to X Corp.'s Rule 60 motion, that objection is misplaced too.  Rule 26(d) governs the timing of discovery in newly filed civil cases, before an initial case management conference has even been held.  *See* Fed. R. Civ. P. 26(f)(1) ("the parties must confer as soon as practicable—and in any event at least 21 days before a scheduling conference is to be held or a scheduling order is due under Rule 16(b).").  X Corp. seeks relief under Rule 60, which can only occur after entry of final judgment.  Rule 26 does not apply in this posture.

### D.      EY Has Not Carried Its Burden To Show Undue Burden

EY's undue-burden objection fails because it has not made the required "specific, detailed showing of how the discovery request is burdensome."  *Thong v. Salon*, No. 06 Civ. 1807 (RCL) (AK), 2008 WL 11391660, at *1 (D.D.C. Dec. 1, 2008).  Often, "federal courts reject out of hand claims of burdensomeness which are not supported by a specific, detailed showing, usually by affidavit, of why weighing the need for discovery against the burden it will impose permits the conclusion that the court should not permit it."  *Nat. Res. Def. Council v. Curtis*, 189 F.R.D. 4, 13 (D.D.C. 1999); *see In re Motion to Compel Compliance with Subpoena Directed to Cooke Legal Grp., PLLC*, 333 F.R.D. 291, 295 (D.D.C. 2019).  Here too, "[g]eneral objections or boilerplate objections 'do not comply with Fed. R. Civ. P. 34(b) and courts disfavor them.'"  *Mass. Hous. Fin. Agency*, 2005 WL 8178349, at *3 (quoting *Athridge v. Aetna Cas. & Surety Co.*, 184 F.R.D. 181, 190 (D.D.C. 1998)).

EY has failed to explain why producing documents pursuant to the requests would be unduly burdensome, and its objection should be overruled for that reason alone.  For example,

there can be no cognizable burden whatsoever in producing to X Corp. what EY already produced to the FTC, given those documents have been reviewed, processed, and prepared for production within the last six months.  That is nothing more than a push-button exercise.  Yet EY refused even that compromise offer, which X Corp. made both before and after issuing the subpoena.  Koffmann Decl. ¶¶ 22–23.  *See In re Firstenergy Corp. Sec. Litig.*, 229 F.R.D. 541, 545 (N.D. Ohio 2004) (a party "cannot … allege any burden from providing documents that it has already reviewed and compiled"); *Pension Tr. Fund for Operating Engineers v. Assisted Living Concepts, Inc.*, 943 F. Supp. 2d 913, 915 (E.D. Wis. 2013) ("[W]here documents have already been collated and produced to other entities, the burdens of discovery are far less substantial."); *Willis v. Big Lots, Inc.*, No. 2:12 Civ. 604, 2014 WL 12656500, at \*2 (S.D. Ohio Apr. 16, 2014) (similar).  And for the reasons detailed above with respect to relevance, it is simply untrue that the subpoena seeks documents with "minimal value… in resolving the issues in the Action."  Ex. 17 at 6.  EY has played a central role in the underlying dispute and its documents are likely to provide information critical to resolving X Corp.'s pending motion.

To the extent that EY asserts this objection on the basis that the discovery sought can be obtained from other sources, "Rule 45 does not require a party to demonstrate that information cannot be obtained from another party before subpoenaing it from a third party."  *Ceuric v. Tier One, LLC*, 325 F.R.D. 558, 561 (W.D. Pa. May 17, 2018).  Accordingly, these objections should be overruled.

### E.    EY's Attorney-Client Privilege & Work Product Objections Are Insufficient

EY's privilege objections cannot justify wholesale refusal to respond to the subpoena. "[T]he attorney-client privilege must be strictly confined within the narrowest possible limits consistent with the logic of its principle."  *In re Lindsey*, 158 F.3d 1263, 1272 (D.C. Cir. 1998). This privilege "carries costs," including the withholding of potentially critical evidence from the

factfinder. *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 764 (D.C. Cir. 2014). Courts tolerate the privilege only to the extent necessary "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice." *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998); *Western Trails, Inc. v. Camp Coast to Coast, Inc.*, 139 F.R.D. 4, 8 (D.D.C. 1991) ("The privilege is an exception … to the fundamental principle that discovery should be liberal and broad in furtherance of the search for truth.").

"[G]eneral claims of privilege are inadequate" objections under the Federal Rules of Civil Procedure. *Klayman v. Judicial Watch, Inc.*, No. 06 Civ. 670 (CKK) (AK), 2008 WL 11394169, at *3 (D.D.C. Mar. 12, 2008). Furthermore, if responsive documents exist and have been withheld, EY is required to compile and serve X Corp. with a privilege log which complies with Rule 26(b)(5). *See id.* ("Plaintiff did not provide a privilege log or other means for the Court or opposing counsel to evaluate whether the materials sought were, in fact, subject to the enumerated privileges. . . . [T]he Court finds that Plaintiff's general claims of privilege are inadequate under Rule 26(b).").

EY objects to the production of "memoranda and notes drafted by EY's counsel relating to communications with the FTC." Ex. 17 at 8. But EY "bears the burden of proving that the communications are protected," *In re Lindsey*, 158 F.3d at 1270, and "[a]s oft-cited definitions of the privilege make clear, only communications that seek 'legal advice' from 'a professional legal adviser in his capacity as such' are protected." *Id.* "A lawyer's profession is not a talisman of privilege, automatically granting attorneys immunity from discovery under the federal rules." *Bank of Am. v. Ga. Farm Bureau Mut. Ins. Co.*, No. 3:12 Civ. 155 (CAR), 2014 WL 4851853, at *2 (M.D. Ga. Sept. 29, 2014). Request 2 seeks documents that "describe, summarize, memorialize,

or otherwise record or attempt to record any oral communications between you and the Federal Trade Commission." Ex 16. "No contention can be made that the attorney-client privilege precludes disclosure of factual information. The privilege does not protect facts communicated to an attorney." *Smith v. Gen. Mills, Inc.*, No. C2 04-705, 2006 WL 7276959, at *3 (S.D. Ohio Apr. 13, 2006). To the extent that the memoranda and notes "convey[] … facts acquired from other persons or sources, those facts are not privileged." *Neuder v. Battelle Pac. Nw. Nat. Lab'y*, 194 F.R.D. 289, 292 (D.D.C. 2000) (citation omitted). And "[w]here business and legal advice are intertwined, the legal advice must predominate for the communication to be protected." *Id.* Moreover, "a corporate client should not be allowed to conceal a fact by disclosing it to the corporate attorney." *Id.* at 293 (citation omitted). Thus, EY must produce any memoranda or notes that do not contain legal advice and must log any withheld or redacted portions of documents that do contain legal advice.

### F.   EY's Confidentiality Objection Is Insufficient

EY further objects to the subpoena to the extent it seeks confidential, proprietary, and sensitive business information of non-party EY, including, but not limited to, confidential internal correspondence between EY employees. But a party may not rely on the confidential nature of documents as a basis for refusing to produce them, because "[c]onfidentiality does not equate to privilege." *Hill v. Dillard's, Inc.,* No. 00–2523–JWL, 2001 WL 1718367, *4 (D. Kan. Oct.9, 2001). As the Supreme Court has recognized, "there is no absolute privilege for ... confidential information" and "orders forbidding any disclosure of trade secrets or confidential commercial information are rare." *Federal Open Market Committee v. Merrill*, 443 U.S. 340, 362 & n. 24 (1979); *see also Morrison-Knudsen Co. v. Department of Army*, 595 F.Supp. 352, 355 (D.D.C. 1984), *aff'd mem.,* 762 F.2d 138 (D.C. Cir. 1985). "A survey of the relevant case law reveals that discovery is virtually always ordered once the movant has established that the secret information

is relevant and necessary." *Coca-Cola Bottling Co. of Shreveport v. Coca-Cola Co.*, 107 F.R.D. 288, 293 (D. Del. 1985).  EY has not even attempted to demonstrate that its information is confidential.  Should it do so, EY may seek a protective order to prevent the disclosure of the documents to third parties.  *See* Fed. R. Civ. P. 26(c).

### G.   EY's Objections That The Document Requests Are Vague and Ambiguous Are Also Without Merit

EY's response generally objects "to the extent that individual Requests in the Subpoena are not set forth with sufficient particularity or contain terms that are argumentative, insufficiently defined, vague, ambiguous, and/or unlimited in scope," and also specifically objects that the meaning of one or more terms within a request or topic is "vague and ambiguous."  *See* Ex. 17. But asserting that requests or terms are vague or ambiguous without any explanation is not a valid objection.  *See Klayman*, 2008 WL 11394169, at *3 (rejecting plaintiff's "boilerplate objections, such as vagueness, burden, relevance and privilege" because these boilerplate objections are "inconsistent with both the letter and the spirit of the Federal Rules of Civil Procedure"). Furthermore, the terms that EY asserts are vague and ambiguous—*e.g.*, "you," and "X Corp,"— are specifically defined within the subpoena.  *See* Ex. 16 at 5–7 ("Attachment A").  The objection is baseless.

## V.    CONCLUSION

For the foregoing reasons, X Corp. respectfully requests the Court grant this Motion and issue an order requiring EY to produce all responsive documents immediately.

DATED: August 25, 2023             Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


By  /s/ Christopher G. Michel
    QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
    Christopher G. Michel (DC Bar ID: 1034557)
    Casey J. Adams (DC Bar ID: 90012729; *pro hac
    vice* application forthcoming)
    Rachel G. Frank (DC Bar ID: 1659649; application
    to this court pending)
    1300 I Street NW, Suite 900
    Washington, D.C. 20005
    Telephone: (202) 538 8000
    Facsimile: (202) 538 8100
    christophermichel@quinnemanuel.com
    caseyadams@quinnemanuel.com
    rachelfrank@quinnemanuel.com

    Alex Spiro (*pro hac vice* application forthcoming)
    Daniel R. Koffmann (*pro hac vice* application
    forthcoming)
    51 Madison Ave, 22nd Floor
    New York, NY 10010
    Telephone:  (212) 849-7000
    Facsimile:  (212) 849-7100
    alexspiro@quinnemanuel.com
    danielkoffmann@quinnemanuel.com

    *Attorneys for X Corp.*