# EXHIBIT 7

```
 1                    UNITED STATES OF AMERICA

 2             BEFORE THE FEDERAL TRADE COMMISSION

 3

 4   In the Matter of             )

 5   UNITED STATES OF AMERICA,    )

 6   V.                           )  Docket No. C-4316

 7   TWITTER, INC.                )

 8                                )

 9        ------------------------)

10

11                          Wednesday, June 21, 2023

12                          Via Zoom videoconference

13

14            The above-entitled matter came on for

15   deposition, pursuant to notice, at 12:30 p.m. Eastern,

16   for the testimony of:

17

18                    DAVID ROQUE

19

20

21

22   Reported by:  DEBORAH WEHR, RPR

23

24

25
```

Roque

USA v. Twitter, Inc.                                      6/21/2023

1   are ready.  I was pointing out the questions are

2   pending.  If you are saying these are all

3   attorney-client privileged matters, I understand that,

4   and I appreciate that clarification.

5          MS. VANDRUFF:  Happy to.  Ms. Wehr, if you will

6   read the question back to Mr. Roque.

7          (The record was read as requested.)

8          MS. VANDRUFF:  And my instruction was that this

9   was vague and lacks foundation.

10          Mr. Roque, you can answer the question.

11          THE WITNESS:  As we were moving forward with

12   this engagement, we had ongoing discussions with the

13   FTC.  And during those discussions, the FTC kept

14   expressing their opinion more and more adamantly about

15   the extent of procedures Ernst & Young would need to

16   perform based on their expectations.  And there was

17   also expectations around the results they would expect

18   us to find based on the information Twitter had already

19   provided to the FTC and the FTC had reviewed.

20          I raised a personal concern that I felt as if

21   the FTC was trying to influence the outcome of the

22   engagement before it had started, and I was trying to

23   make sure that the way the conversations with the FTC

24   were transpiring we didn't have an adverse threat from

25   an independent interest.  In other words, was there

Roque
USA v. Twitter, Inc.                                        6/21/2023

1    somebody outside of the arrangement we had with Twitter

2    trying to influence the outcome of our results.

3           BY MS. COLLESANO:

4      Q.   In the conversations that you had with the FTC,

5    was the focus on getting appropriate information to

6    make sure that the program mandated under the order was

7    operating effectively?

8      A.   Yes.

9           MS. COLLESANO:  Ms. VanDruff, I'm finished with

10   this exhibit if you want to take that break now.

11          MS. VANDRUFF:  I do.  If you don't have

12   follow-up questions about Exhibit 9, that would be

13   helpful.  Thank you.

14          MS. COLLESANO:  How long would you like?

15          MS. VANDRUFF:  Five minutes would be helpful.

16          MR. KOFFMANN:  Can we make it ten minutes, if

17   you don't mind.

18          MS. COLLESANO:  Sure.

19          (A recess was taken.)

20          BY MS. COLLESANO:

21     Q.   I was trying to get you a break, I'm sorry if

22   we went a little long.  You can just stop me.  I'm

23   happy to take breaks when you guys need them.

24          Just going back to Exhibit 9, on the third page

25   near the bottom at 8:28 p.m., you say, "I was thinking

Roque
USA v. Twitter, Inc.                                          6/21/2023

```
 1   EY interests are not aligned with Twitter anymore
 2   because of the FTC."  What did you mean by that?
 3        A.   Before the break, I was just personally getting
 4   concerned that our obligation under our contract is to
 5   go in and do the independent assessor report and then
 6   report the facts based on the results.  In some of the
 7   discussions that we were having with the FTC,
 8   expectations were being conveyed about what those
 9   results should be before we had even begun any
10   procedures, and I was concerned that there was this
11   adversarial situation occurring where you had two
12   competing parties that, stepping back, both had a
13   desire for a certain outcome to occur that may not have
14   always been aligned.
15        Q.   It seems to implicate that at least at one
16   point you thought EY's interests were aligned with
17   Twitter.
18        A.   No.  That was not the intent to say I had an
19   allegiance or alignment with any entity.
20        Q.   To be clear, no one from the FTC directed you
21   to reach a particular conclusion about Twitter's
22   program, correct?
23        A.   There was suggestions of what they would expect
24   the outcome to be.
25        Q.   Did the FTC convey concerns about the level of
```

Roque

USA v. Twitter, Inc.                                              6/21/2023

1    change at Twitter and things that had been revealed

2    through the press that --

3        A.   The -- sorry, you instructed me not to talk

4    over you.  I apologize.

5            MS. VANDRUFF:  Anne, I apologize.  Would you

6    like to restate your question?

7            MS. COLLESANO:  If Mr. Roque had something to

8    say, I'm happy to let him make his statement.

9            THE WITNESS:  No, just finish your question so

10   I can make sure I answer it correctly.

11           MS. COLLESANO:  Deborah, can you read back what

12   I said, please.

13           (The record was read as requested.)

14           BY MS. COLLESANO:

15       Q.   That were developing and that the FTC would

16   want to make sure EY examined in its assessment of

17   Twitter's program?

18       A.   Yes.

19       Q.   I believe you testified earlier that you were

20   also reading news reports in November of 2022 and had

21   concerns as well; is that correct?

22           MS. VANDRUFF:  Objection.  Mischaracterizes

23   prior testimony.

24           You may answer the question.

25           THE WITNESS:  I don't know that I had concerns.

124

Roque

USA v. Twitter, Inc.                                                6/21/2023

```
 1    There was just a lot going on that we were trying to
 2    figure out what was fact from fiction.
 3          BY MS. COLLESANO:
 4      Q.  And a lot of these changes -- a lot of these
 5    changes created more work for EY in the assessment,
 6    correct?  More that needed to be reviewed?
 7      A.  I don't know for sure since we didn't do the
 8    work.  The amount of change did require more work in
 9    just trying to understand the impact of that change.
10      Q.  No one from the FTC actually told you what EY's
11    report should say in its conclusions, correct?
12          MS. VANDRUFF:  Objection.  Leading.
13          You may answer the question.
14          THE WITNESS:  There was a conversation where it
15    was conveyed that the FTC would be surprised if there
16    was areas on our report that didn't have findings based
17    on information the FTC was already aware of, and if
18    Ernst & Young didn't have findings in those areas, we
19    should expect the FTC would follow up very
20    significantly to understand why we didn't have similar
21    conclusions.
22          BY MS. COLLESANO:
23      Q.  I'm going to show you another document.
24          (Roque Deposition Exhibit Number 10 was marked
25    for identification.)
```

199

Roque

USA v. Twitter, Inc.                                                6/21/2023

 1   impression that you characterized earlier about their

 2   expectation about the outcome of the order assessment

 3   that Ernst & Young was conducting?

 4        MS. COLLESANO:  Objection.  Mischaracterizes

 5   prior testimony.

 6        THE WITNESS:  The meeting in December was --

 7   the meeting in December was more, from my recollection,

 8   interesting in the standpoint of we were -- the FTC had

 9   reached out.  They had wanted to talk to Ernst & Young

10   directly and see what information we knew about the

11   amount of change that was taking place in Twitter

12   during the month of November after the acquisition and

13   what we were seeing, with the assumption that we were

14   already on the ground and onsite and sort of executing

15   work.

16        As part of that, we informed them that we

17   hadn't actually executed any procedures.  We were

18   having some challenges in tracking down key contacts.

19   The information that we were getting was primarily

20   based from articles in the press, and you know, we were

21   trying to figure out what to do.  And I believe a

22   question was asked "what do you mean trying to decide

23   what to do?"  And we said, "well, we are trying to

24   consider everything from when can we start field work?

25   Where does this reside?  Are they going to fire us?"  I

200
Roque
USA v. Twitter, Inc.                                                   6/21/2023

 1    mean, we just didn't know.

 2           And one of the comments at that point was made

 3    that Ernst & Young, under all circumstances, will be

 4    conducting and issuing a report on behalf of the FTC

 5    order.  So it was sort of like it was very adamant

 6    about this is absolutely what you will do and this is

 7    going to occur, and you'll produce a report at the end

 8    of the day.

 9           So for me, that was a bit surprising to be so

10    adamant about that not knowing what could have

11    transpired over the next six to seven months before

12    that report was due.

13           BY MR. KOFFMANN:

14      Q.   Just to be clear, I believe you testified

15    earlier, but correct me if this is not your testimony

16    or if this is not an accurate description of the sense

17    that you got based on your interactions with the FTC

18    but that you had the impression, based on your

19    conversations with the FTC, that the FTC expected that

20    the report that Ernst & Young would issue would

21    conclude or would have findings or, in other words,

22    would conclude that there were deficiencies in

23    Twitter's privacy and information security program?

24           MS. VANDRUFF:  Objection.  Misstates prior

25    testimony.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

201
Roque
USA v. Twitter, Inc.                                               6/21/2023

1        You may answer the question.

2        MS. COLLESANO:  Objection.  Vague.

3        THE WITNESS:  You are correct.  I apologize.  I

4   stopped to see if you had questions and I didn't

5   finish.  Your broader question of what happened, there

6   was sort of two meetings.  That was the first one in

7   December, which was sort of expectations were

8   definitely set from that meeting.

9        And then I forget the second meeting we had in

10  January where they were asking about the extent of our

11  procedures and the results.  And at that meeting, I

12  believe, they started providing areas that they were

13  expecting us to look at.  They had given us a list of

14  specificity of the types of procedures they were

15  expecting us to execute, and they also said -- that was

16  the meeting where it was communicated that they would

17  expect Ernst & Young to have findings or exceptions or

18  negative results in certain areas based on what they

19  already understood from an operational standpoint,

20  based on information Twitter had provided, and that if

21  we ended up producing a report that didn't have

22  findings in those areas, that they would be surprised,

23  and they would be definitely following up with us to

24  understand why we didn't -- why we reached the

25  conclusions we did if they were sort of not reflecting

202

Roque

USA v. Twitter, Inc.                                    6/21/2023

1    gaps in the controls.

2            BY MR. KOFFMANN:

3        Q.   So the expectation that the FTC conveyed about

4    the results of the assessment and what would happen if

5    Ernst & Young concluded its work without making

6    findings or exceptions, that was communicated not at

7    the initial meeting in December, but only at the

8    subsequent meeting; is that correct?

9        A.   That's correct.

10       Q.   So let's go back to the December meeting.

11   During that meeting, what was conveyed to you was that

12   the FTC had a definite expectation that Ernst & Young

13   would issue a report; is that correct?

14       A.   That's correct.

15       Q.   And I believe you said before that you found

16   that surprising; is that right?

17       A.   Surprising from the standpoint of there was so

18   much change going on, there was press communications

19   about the company going through and firing a variety of

20   providers on a variety of fronts, that there was -- I

21   don't think it was unreasonable for somebody to come

22   along and say "we are not going to use Ernst & Young

23   for this; fire them and go get somebody else."  It was

24   just speculation, I guess, but the FTC was very adamant

25   that it would be Ernst & Young.  And I sort of stepped

203

Roque

USA v. Twitter, Inc.                                      6/21/2023

 1    back and said "a lot is going on; who knows."  I didn't
 2    say that to them.  That was sort of what I thought.
 3        Q.  Did the possibility that Ernst & Young would
 4    not complete the assessment come up at that December
 5    meeting?
 6        A.  No, I don't believe it did.
 7        Q.  Okay.  Anything else that happened in that
 8    December meeting that gave you the impression that the
 9    FTC had expectations about what Ernst & Young would
10    conclude in its order assessment engagement?
11        A.  Not on a conclusion standpoint in the December
12    the meeting.
13        Q.  Did anything else happen at the December
14    meeting that you would characterize as unusual?
15            MS. VANDRUFF:  Objection.  Vague.
16            You may answer.
17            THE WITNESS:  For me, yes.  There was a level
18    of specificity on the execution of very specific types
19    of procedures that they expected to be performed.  It
20    was almost as if they were giving us components of our
21    audit program to execute.
22            BY MR. KOFFMANN:
23        Q.  And why was that unusual?
24        A.  Because I usually wouldn't have a third
25    party -- well, having a third party is an unusual

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Roque

```
 1    situation in general for providing a test report.  But
 2    if a third party usually wants a specific procedure
 3    performed, then that type of engagement usually would
 4    not be a testing engagement.  We would call it agreed
 5    upon procedures, where all the parties involved in
 6    getting the report would agree on the specific
 7    procedures to be executed so that they all agree that
 8    they would be done for the particular needs and wants
 9    of the users of the report.
10            The other component of that was a little
11    unusual -- the other component of that report was that
12    the -- our approach is you look at the processes and
13    controls.  So we say, "okay, how does security operate?
14    How does the user administration process manage?  How
15    are changes developed and pushed to production?"  And
16    we look at the controls in those.
17            The requests we were looking at were very
18    specific of, you know, going across the entire service
19    to execute certain commands to make sure certain
20    settings were existing or not, for example.  And as
21    auditors, they are not specifically required or there's
22    a need to based on a perceived risk, we, once again,
23    audit for the processes and controls that mitigate the
24    general risks.  Not going into some of the one-offs,
25    very specific details they were asking us about.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555